77 Wn.2d 487 (1969)
463 P.2d 626
PACIFIC NORTHWEST CONFERENCE OF THE FREE METHODIST CHURCH OF NORTH AMERICA, Respondent,
v.
C.L. BARLOW et al., Appellants.[*]
No. 40343.
The Supreme Court of Washington, En Banc.
December 31, 1969.
Robert E. Schillberg and Elmer E. Johnston, Jr., for appellants.
Thomas J. Isaac, for respondent.
ROSELLINI, J.
This is an action to recover property taxes paid to Snohomish County and to restrain the collection of further taxes upon 172 acres of land used as a bible camp by the respondent. The trial court held that the land, except for a leased lot area and a rented cabin, was used for the religious purposes of the respondent and was exempt from taxation.
*488 Of the numerous errors assigned by the appellants, we find it necessary to consider only those which raise the contention that the trial court erroneously construed the applicable exemption statutes to cover the property used for the camp. Since it is our conclusion that the property is not exempt under the statutes, the judgment must be reversed and the other assignments of error become immaterial.
RCW 84.36.020 provides:
The following property shall be exempt from taxation:
...
All churches, built and supported by donations, whose seats are free to all; and the ground, not exceeding five acres in area, upon which any cathedral or church of any recognized religious denomination is or shall be built, together with a parsonage. The area exempted shall in any case include all ground covered by the church and parsonage and the structures and ground necessary for street access, light, and ventilation, but the area of unoccupied ground exempted in such cases, in connection with both church and parsonage, shall not exceed the equivalent of one hundred twenty by one hundred twenty feet. The parsonage need not be on land contiguous to the church property if the total area exempted does not exceed the areas above specified. To be exempt the grounds must be used wholly for church purposes.
RCW 84.36.030 provides:
The following property shall be exempt from taxation:
Property of nonsectarian organizations or associations, organized and conducted primarily and chiefly for religious purposes and not for profit, which shall be used, or to the extent solely used, for the religious purposes of such associations, or for the educational, benevolent, protective, or social departments growing out of, or related to, the religious work of such associations;
Property of nonprofit organizations or associations engaged in character building in boys and girls under twenty-one years of age, to the extent such property is necessarily employed and devoted solely to the said purposes, provided such purposes are for the general public good and such properties are devoted to the general public benefit;
*489 The evidence showed that the property in question is owned by the respondent, a sectarian organization, and was established with the purpose which is set forth in the findings of fact:
The Purpose of the Warm Beach Camp is to exalt Jesus Christ by organizing, promoting, developing and conducting Bible-centered conference and camping programs to win people to Christ, to nurture Christian character, to train for World-wide Christian service and to strengthen family life through recreation, instruction and inspiration in a wholesome environment.
The property is used as a summer recreation camp by members of the Free Methodist Church, and when they are not using it, it is rented to other groups which meet the respondent's specifications. As stated in the findings, "the majority of the use has been that of non-Free Methodist groups from Evangelical churches in the Pacific Northwest." On one occasion the camp was used by Camp Fire Girls and on another by the Seattle Public Schools, who conducted a camping session for disadvantaged students.
A uniform rate for food and lodging is charged, and the rate is the same whether the camp is being used by the Free Methodists or others. The earnings over and above expenses are used to retire the mortgage. The camp is subsidized also by donations from church members.
The buildings on the property are of the kind which are generally found at a large resort. There is a large dining hall, a dormitory and numerous cabins and small lodges for sleeping, a tennis court, a volleyball court, a "snack" stand at which food and drinks are sold, stables and horses, a nature trail, a book store, a gymnasium, a Christian-education building, a swimming pool, and a baseball diamond. Beef cattle are pastured on part of the land to supply meat for the kitchen.
The property is located at Warm Beach on Puget Sound.
While there is no church on the premises, church services are conducted in the building which houses the dining hall. In 1966, services were held there on 153 days. Other meetings are held also in this part of the dining hall building.
*490 The camp does not dispense charity. It is simply a place where members of the faith and others who are acceptable to them can vacation together in a religious atmosphere. There is no question but that the religious teaching administered there is sectarian in nature, whether it be while the camp is used by Free Methodists or by other religious groups. The only nonsectarian use occurred during the brief periods when the facilities were rented to the Camp Fire Girls and to the Seattle Public Schools. As the superintendent of the Pacific Northwest Conference of Free Methodist Churches testified, the primary purpose of the camp is to serve the Free Methodists, and if enough usage could be "generated" by the Free Methodists, it would be used exclusively by them.
In regard to the purpose of the camp, the superintendent said:
Well, the function of the Warm Beach Camp is to provide the facilities necessary for the churches' ministry to its young people and families that can be done better in a camping situation than it might be done in the normal church situation.
It is plain, therefore, that the camp is used  to the extent that it is used for a religious purpose  for the same purpose that a sectarian church is used, namely, as a place of sectarian teaching and worship. However, the trial court found that there is no building on the premises which would qualify as a church under RCW 84.36.020. This finding is not challenged.
Nevertheless, the court was of the opinion that the property is exempt under the first paragraph of RCW 84.36.030, providing for the exemption of property of nonsectarian organizations or associations, organized and conducted primarily and chiefly for religious purposes and not for profit. The trial court concluded that this court had held, in Norwegian Lutheran Church of America v. Wooster, 176 Wash. 581, 30 P.2d 381 (1934) and Wesley Foundation v. King County, 185 Wash. 12, 52 P.2d 1247 (1935), that property owned by sectarian organizations and used for sectarian *491 purposes is exempt, under this paragraph of RCW 84.36.030.
The appellants seem to concur in this interpretation of those cases, but they contend that, to the extent that the property was used for revenue-producing purposes, it was not used for religious purposes, within the meaning of the statute. They rely upon Norwegian Lutheran Church of America v. Wooster, supra, for this proposition. In arguing this theory, the appellants maintain that the trial court incorrectly limited the holding of that case to situations where the owner relinquishes control of its property under a lease.
We are of the opinion that the appellants are correct in their view that the holding of Norwegian Lutheran Church of America v. Wooster, supra, is not limited to situations where there has been complete relinquishment of control on the part of the property owners. This question will be discussed later in the opinion.
The appellants urge also that the two cases just cited erroneously construed RCW 84.36.030, and that the statute, by its express language, exempts only property used for nonsectarian religious purposes and does not exempt property which is used for sectarian purposes.
We are of the opinion also that the appellants are correct in their contention that the statute exempts only property used for nonsectarian purposes, but we do not find it necessary to overrule Norwegian Lutheran Church of America v. Wooster, supra, and Wesley Foundation v. King County, supra, in order to give judicial recognition to the declared intent of the legislature. While it is true that in one of those cases the owner of the property was a sectarian organization and we said that this fact was immaterial, in both cases the use made of the property was nonsectarian. The use made of the property, we said, was the controlling factor. Neither expressly nor impliedly did this court hold that property used for sectarian purposes is exempt under RCW 84.36.030.
The respondent's attorney appears to be more aware of this fact than is the appellants'. He argues that the use is *492 nonsectarian because the "declaration of purpose" does not mention the Free Methodist Church. However, the record shows clearly that the use, whether by the respondent or by others, was predominantly sectarian in character. The trial court made no finding to the contrary, nor could such a finding be supported by the record.
The court would not be warranted in attaching a liberal interpretation to the language used in the cited cases, inasmuch as we were concerned with the construction of an exemption statute.
[1] It is the well-settled rule in this jurisdiction that statutes exempting persons or property from taxation are to be strictly construed, and that exemptions are not to be extended by judicial construction to property other than that which is expressly designated by law. Fibreboard Paper Prods. Corp. v. State, 66 Wn.2d 87, 401 P.2d 623 (1965); Crown Zellerbach Corp. v. State, 45 Wn.2d 749, 278 P.2d 305 (1954); Norwegian Lutheran Church of America v. Wooster, supra; Spokane County v. Spokane, 169 Wash. 355, 13 P.2d 1084 (1932); Foley v. Oberlin Congregational Church, 67 Wash. 280, 121 P. 65 (1912); Thurston County v. Sisters of Charity of the House of Providence, 14 Wash. 264, 44 P. 252 (1896).
As we observed in a number of those cases, all presumptions are against an intention of the state to bind itself by the exemption of property from taxation, and it devolves upon those claiming the exemptions to show clearly that the property is within the statutes.
There appears no sound reason to retreat from this rule. It is widely recognized that tax exemptions create inequities in the distribution of the tax burden, even where the exempted property is being used for some function which it would be the duty of the state to perform if it were not performed by private individuals or organizations.[1] This is *493 so because rarely are the benefits of an exempted property conferred only upon those who must bear the increased tax burden.
The case at hand illustrates these inequities. While it may be acknowledged that the function of the camp is to provide not only recreation but character building activities, those activities take the form of the teaching of a particular religious creed. The state could not directly subsidize such an activity, since Const. art. 1, § 11 expressly forbids the expending of public money for religious instruction. (See Calvary Bible Presbyterian Church v. Board of Regents, 72 Wn.2d 912, 436 P.2d 189 (1967).)[2] Therefore, it cannot be convincingly argued that the camp is performing a function which the state would ordinarily have the burden of performing at the taxpayers' expense.
Also, there is in this case no attempt to show that only residents of Snohomish County are accommodated at the camp. What evidence the record contains on the matter indicates that many if not most of the campers come from other counties  and some come from outside the state. Thus, if the property is exempted, the taxpayers of Snohomish County must bear the burden of providing recreation and sectarian religious teaching for nonresidents.
Not only does the granting of exemptions result in an unequal distribution of the tax burden, but it also reduces the amount of revenue available to the governing body *494 through reduction of the tax base.[3] If the exemption in this case were sustained, 172 acres of valuable land would be lost to the county. And if this exemption is valid, then what is to stop all other religious sects from establishing similar camps? Soon those counties which are comprised largely of lands suitable for recreational purposes might well be threatened with the loss of a disastrously large portion of their normal source of revenue. While retaining the obligation to render services to the land held for recreational use by religious sects, it could not look to that land for its *495 proportionate share of the funds needed to perform those services.
Of course, it is not the function of this court to determine the wisdom of legislative policy, and those exemptions which have been expressly granted under constitutionally valid statutes must be given recognition. We mention these factors affecting policy only to demonstrate the rationality of the rule of strict construction.
[2] This court approached the question presented in Norwegian Lutheran Church of America v. Wooster, 176 Wash. 581, 30 P.2d 381 (1934), with the rule of strict construction expressly in mind. In that case, the plaintiff, a sectarian organization, owned a building located on First Avenue in Seattle, in which it conducted a charitable activity for the benefit of the unfortunate men who frequented that area and were in need of food and shelter. On three floors of its building, the plaintiff provided sleeping rooms, food and a place to relax, charging no one for food and only those who could afford to pay for a bed. It also provided an area for relaxing and conducted nonsectarian services in a small chapel. This court held that this portion of the building was exempt under RCW 84.36.030, against a contention of the defendant that, because the plaintiff organization was itself sectarian, the property could not qualify for the exemption. It said, at 588: "Whether the owner be sectarian or nonsectarian, the use to which the property is devoted determines the question of exemption from taxation."
In that case, it was conceded that the use was nonsectarian.
In Wesley Foundation v. King County, supra, the sole question before the court was whether the property was used for a sectarian or a nonsectarian purpose. The property in question was the "Wesley House," a building used for social and devotional purposes by students of the University of Washington. The trial court had found and this court sustained the finding that the religious exercises conducted there were not of a sectarian nature. The services of Wesley House were offered to students of all denominations and were free of cost. The assistant dean of men of the *496 university had testified that the house and others like it performed a function of rendering needed services to students which the university itself did not provide.
Although the Wesley Foundation declared itself to be nonsectarian, there was evidence that it was supported by the Methodist Church. Holding that Norwegian Lutheran Church of America v. Wooster, supra, was decisive of the issue presented in the case before the court, we said in Wesley Foundation v. King County, 185 Wash. 12, 17-18, 52 P.2d 1247 (1935):
As we have seen, the Wesley Foundation itself is organized as a nonprofit, nonsectarian corporation, and the property involved is in the name of this corporation. But if it were otherwise, and the property belonged, in fact, to the Methodist Church, its status as exempt property would be the same. So long as the property is devoted to the uses contemplated by the statute, it is entitled to exemption, regardless of the sectarian character of the owner. That the activities of the Wesley Foundation are nonsectarian in a proper sense, we have no doubt.
In further elaboration, we said:
The statute itself does not define sectarian or nonsectarian. In its origin, the word sectarian had an invidious implication, but it has long been used in this country as approximating in meaning the word denominational. Now, a candid reading of the record in this case does not disclose any evidence of the use of the Foundation by the Methodist Church for propoganda or proselyting. Its function is to encourage men and women coming within the scope of its influence to embrace some form of religious life, without specially emphasizing the Methodist Church. Doubtless, the existence of the Foundation, operating under Methodist auspices, may tend to make students of Methodist antecedents more at home there, but, beyond this, the sectarian aspect is negligible.
Here, the sectarian aspect is not negligible. On the contrary, it is admittedly predominant. The very purpose of the camp is to encourage adherence to the church. As the superintendent put it:
Well, the function of the Warm Beach Camp is to provide the facilities necessary for the churches' ministry to its young people and families that can be done better *497 in a camping situation than it might be done in the normal church situation.
In other words, the purpose of the camp was the same as that of the church  to teach a particular set of religious beliefs. The legislature has provided in RCW 84.36.020 for the exemption of property for such purposes. That section exempts churches built and supported by donations, whose seats are free to all, and the maximum amount of land which any church and its parsonage may claim an exemption upon is set at 5 acres. There is no limitation upon the amount of land which an organization using its property for religious purposes can claim under RCW 84.36.030. If that section were held applicable to property used for sectarian purposes, not only would the word nonsectarian be rendered meaningless, but RCW 84.36.020 would become superfluous.
The legislature expressed in that section a clear intent to limit the amount of land which the members of any one church can have exempted for their sectarian purposes. It also expressed an intent to restrict the type of buildings which can be claimed as necessary for church purposes of sectarian organizations. It was not this court's intent in the cited cases to nullify that expressed intent, and the language we used therein cannot be fairly read as accomplishing such a result.
We hold in harmony with those cases that RCW 84.36.030 applies only to property used for nonsectarian purposes, and that it is the use made of the property rather than the identity of the owner which governs the exemption. Consequently, the trial court was in error in holding that the property involved in this case, which is unquestionably used for sectarian purposes, is exempt from taxes.
In Norwegian Lutheran Church of America v. Wooster, supra, we held that a portion of the building which was leased, and the land on which the building was constructed, were subject to taxation because they were not used "wholly and solely for religious purposes." The portion of the building in question was leased to another religious organization which also conducted a nonsectarian religious activity *498 therein. This court held that it was the use made by the owner which controlled the question of taxability, and that the owner, by leasing the property and deriving revenue therefrom, was using the property for a commercial rather than a religious purpose. It was immaterial that the proceeds were used to further the nonsectarian religious purposes of the owner.
The trial court was of the opinion that it was not the deriving of revenue from the property but the relinquishing of control which was important in determining whether the property was used for the religious purposes of the owner. It is true that we said in that case that when an owner leases property, he parts with the possession and use for a consideration. But we said further that he owns and holds the property for the purpose of receiving an income therefrom and his use is therefore a purely commercial one.
We did not suggest in that case that an owner might retain its exempt status by placing certain restrictions upon the use to be made of the property, as was done by the respondent in this case. In that case, the leased portion of the premises was actually used for a purpose much like that of the owner, but this court held that this was immaterial. The important factor was that the owner used it as a source of revenue. That was the predominant use made by the respondent in this case, since, according to the trial court's finding, the facilities are rented to others for a greater portion of the time than they are used by the respondent.
For this additional reason, the judgment must be reversed and the action dismissed.
It is so ordered.
HUNTER, C.J., FINLEY, WEAVER, HAMILTON, HALE, NEILL, and McGOVERN, JJ., concur.
HILL, J., concurs in the result.
March 23, 1970. Petition for rehearing denied.
NOTES
[*] Reported in 463 P.2d 626.
[1] See Schnell, Real Property Tax Exemptions in Ohio  A Review and Critique, 17 W. Res. L. Rev. 824 (1966) (suggesting that only schools and governmental bodies should be exempt); Reitze, Jr., Real Property Tax Exemptions in Ohio  Fiscal Absurdity, 18 W. Res. L. Rev. 64 (1966) (maintaining that all property tax exemptions are inequitable); Stimson, The Exemption of Property from Taxation in the United States, 18 Minn. L. Rev. 411 (1934); and Bennett, Real Property Tax Exemption of Non-Profit Organizations, 16 Clev.-Mar. L. Rev. 150 (Jan. 1967).

The author of a note in 64 Harv. L. Rev. 288 (1950), while appearing to endorse, or at least accept, the propriety of indirect subsidies to private charities, nevertheless offers the view that exemptions should not be granted if they result in financial benefits to the members of the organization, as distinguished from recipients of their charity. He mentions benefits taking such nonpecuniary forms as recreation or price reductions. These are the benefits which would flow from the allowance of an exemption in the present case.
[2] The appellant has not challenged the power of the state to subsidize such teaching indirectly through the granting of tax exemptions, and this question is not before us. See Note, Constitutionality of Tax Benefits Accorded Religion, 49 Col. L. Rev. 968, 982 (Nov. 1949).
[3] Speaking before the Thirty-second Annual Summer Institute of Government in 1967, George Kinnear, Director of the Washington State Department of Revenue, said:

[L]egal exemptions from tax are generally harmful to the community as a whole and create limitations upon public revenue which would properly be available without forcing increased rates. It is undesirable in my opinion to use exemptions as an instrument of either social or industrial policy, and we have done both. [Tax Reform to Meet the Challenge of Growth, Bureau of Governmental Research and Services, University of Washington, Rep. No. 166, at 43 (October 1967).]
Stimson, n. 1 supra, says that in 1922 the value of exempt property in the United States was $20,500,000,000 and that the percentage of exempt property had been steadily increasing since that date. The author (head of the Department of Economics, Municipal University of Omaha, Omaha, Nebraska) says, at 419:
An examination of court opinions discloses the fact that legislation granting indirect subsidies, in the form of tax exemption, is upheld by the courts, even though a direct subsidy to the same institutions would be denied under the doctrine of direct public purpose. This is amply illustrated in the case of churches, sectarian schools, and private industrial enterprises. Tax exemption for paupers or war veterans, on the other hand, is not inconsistent with the public purpose doctrine, since direct aid may be extended to such persons. Courts quite generally have failed to see that tax exemption is a subsidy whose burden rests upon tax payers.
The author concludes, at 428:
The evidence obtained in this study leads to the conclusion that, with very few exceptions  special cases of publicly owned property and of intangibles  no property should be exempted from the property tax. Economic considerations require that taxable capacity, under general property taxation, be measured by the total value of property owned. Exemption of any part of such property reduces the possibility of an equitable distribution of the tax burden.